IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 29, 2012 Session

## IRTIRA HERBERT v. JERALD L. HARDING

**Appeal from the Circuit Court for Davidson County**
**No. 98D2555      Philip E. Smith, Judge**

**No. M2011-00419-COA-R3-CV - Filed August 17, 2012**

The mother of an eleven year old boy asked his father to take care of the child for a few weeks because she was moving out of her apartment. The mother did not find a place of her own for the next six months. Meanwhile, the father enrolled the child in school, boy scouts and football, and filed a petition for change of custody. The father alleged that there had been a change of circumstances in that the mother's unstable home life and frequent moves adversely affected the child at school and elsewhere, and that the child's grades and his attitudes had greatly improved while he was under the father's care. After a hearing, the trial court transferred custody of the child to the father. The mother argues on appeal that, contrary to the trial court's finding, there had not been a material change of circumstances, and that the trial court's decision placed too much emphasis on an incident when she was arrested for shoplifting in the presence of the child. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

BEN H. CANTRELL, SP.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Kathy A. Leslie, Nashville, Tennessee, for the appellant, Irtira Herbert.

Robert Greene, Nashville, Tennessee, for the appellee, Jerald L. Harding.

### OPINION

### I. BACKGROUND

The child at the center of his case was born on June 27, 1997. His mother, Irtira Herbert, and his father, Jerald Harding, were not married, and never lived together. The Department of Children's Services (DCS) began paternity proceedings against Father in

August of 1998 because Mother was receiving public assistance. On July 28, 2000, the parties entered into an agreed order of paternity and support, whereby Mother was awarded custody of the child, and Father was ordered to pay prospective child support together with installment payments on past due child support. There was no visitation provision in the agreed order. At some point, the child's name was changed from Joseph Herbert to Joseph Harding.

Father initially failed to pay the ordered support. On November 21, 2001, Child Support Services of Davidson County, acting on Mother's behalf, filed a petition for criminal contempt against Father, and asked the court to order that all his future payments of child support be made through wage assignment. Father pled guilty to eighteen counts of failing to pay support and was sentenced to ten days in jail for each count, with the sentence to be held in abeyance if he paid the amount owed.

In November 2002, the court found that Father had come into compliance with the support order, and his sentence was deemed to have been served. The proof showed that Father has remained current on his child support since that time, and that the amount of his obligation has increased several times as Father has changed jobs and improved his income.

On or about June 23, 2008, Mother asked Father to take care of Joseph for a few weeks because she was moving out of her apartment. The proof showed that stable housing proved elusive for Mother and that she moved frequently. Father was living in a four bedroom home in Antioch, with his wife and another child, so he had ample room for Joseph. With Mother's agreement, Father enrolled Joseph in a football program and in Boy Scouts, and also enrolled him for the fall semester in Thurgood Marshall Middle School, near his home. Joseph did well at Thurgood Marshall, earning A's and B's in most of his courses.

It took a long time for Mother to find another place to live. She moved in with a member of her church and stayed there for about six months before she was able to secure a more permanent place to stay. Father's payment of child support to Mother by income withholding continued, even though Father was taking care of the child. Mother also claimed Joseph as a dependent for the purpose of obtaining public assistance while the child was in Father's care.

## II. CUSTODY PROCEEDINGS

On October 21, 2008, Father filed a petition to change custody, alleging that Mother's unstable home life and frequent moves adversely affected the child at school and elsewhere, but that the child had shown great improvement under his care. He also asked the court for a temporary restraining order prohibiting Mother from interfering with his peaceful

possession of the child or attempting to remove him from Thurgood Marshall Middle School. The restraining order was granted, to remain in effect pending further orders of the court.

Mother filed an answer and counter-petition, in which she asserted that there was no material change of circumstances and that it was in the child's best interest that primary custody of Joseph remain with her. She also filed a motion to set visitation and to order the parties to attend parenting classes and mediation. On February 8, 2009, the parties entered into an agreed order giving Mother visitation every other weekend. Mediation was attempted, but was unsuccessful.

The case was heard on December 8, 2009. Aside from Father and Mother, testifying witnesses included Mother's mother, friends of both parties, and the child himself. No court reporter was present, and our understanding of what transpired is derived entirely from a Statement of the Evidence filed by the trial court pursuant to Rule 24 of the Tennessee Rules of Appellate Procedure.[1]

The statement recited testimony by the parties and the other witnesses that differed greatly as to the extent of Father's involvement in Joseph's life during the child's early years. Father admitted that he had no relationship with Joseph before his paternity was established, but he testified that he developed a relationship with the child shortly thereafter, and that he visited him regularly, except when Mother would move and not inform him where she had gone, which would briefly disrupt their relationship. Father testified further that as recently as the day of trial he had no way to get in touch with Mother, that she had lived in as many as five different locations over the years and that she had changed her telephone number several times.

Mother testified that Father visited with Joseph in 2003, but that he did not have parenting time with Joseph in 2004, 2005 or 2006, and that he only began to exercise consistent parenting time with Joseph in the summer of 2007, when he began such visitation every other weekend. She also testified that she only lived in four places since 2003. Mother acknowledged that Joseph lived with her mother, Renee Herbert, between Kindergarten and the Fifth Grade, and her testimony was confirmed by Renee Herbert.

Report cards and transcripts entered into the record showed that Joseph was a good student most of the time while in Mother's custody, earning A's and B's in most of his

---

[1] Mother submitted her own Statement of the Evidence, but the trial court declined to approve that statement "as the same is not a fair, accurate and complete account of what transpired at trial." The court accordingly prepared its own Statement of the Evidence, which we rely upon. See Tenn. R. App. P. 24(e), (f), and (g).

courses. But in fourth grade he was enrolled in an accelerated program at Eakin Elementary School, where he had a difficult time, and earned only C's and D's. The record also showed that during that year, Joseph had fifteen absences from school, of which nine were unexcused, and that he was tardy twenty-five times.

As we noted above, Joseph's grades improved after he was enrolled at Thurgood Marshall Middle School. Father testified that he worked with Joseph to ensure that his homework was completed nightly, and that he went to the school to meet with Joseph's teachers 25 or 30 times. He also stated that he took Joseph to almost all of his football practices and games and to all scout meetings and camping trips. There was also testimony that Mother often promised to come to Joseph's football games, but that she only came to one, and that Joseph was often disappointed by her absence.

One incident that figures prominently in this case involved Mother's arrest and conviction for shoplifting in 2004. The proof showed that Joseph was with Mother when that arrest occurred. Mother admitted to one other arrest and conviction for shoplifting, but stated that the child was not with her during the second arrest. She also testified that "while shoplifting was wrong, she actually had no regrets in life and can only teach Joseph that shoplifting is wrong."

Another incident occurred in 2009, while Joseph was in Father's care. A police report that was entered into the record without objection from either party stated that Joseph and another boy stole money from a candy fundraiser box in a home room classroom. According to the reporting officer's narrative of the crime, Joseph "said that his mother would steal all the time but his father broke him from doing that." The school suspended both boys.[2]

When Joseph took the stand, he "did express a preference to reside with [Mother]," and "did not really plan to live with [Father]." He also testified that he was aware that Mother had shoplifted, that he was with Mother on one or two occasions when she shoplifted, and that he himself had stolen on two occasions.

After the close of proof, the trial court announced its findings and its ruling on the question of custody. It reserved the issue of child support for further hearing. The court's decision was documented in a final custody order, entered on October 15, 2010. The court found that a material change of circumstances had occurred, which affected Joseph's welfare. The court described this change as "due to a combination of events including the child

---

[2]During oral argument, Mother's attorney stated that Joseph stole money "in the father's presence." When she was challenged, she acknowledged that she had mispoken, and that she should have said that it happened while Joseph was in the father's custody - a significant difference.

moving in with his father in June 2008, the improvement of his grades with the assistance of his father, the arrest of the mother in the presence of the child and subsequent conviction for shoplifting."

The court then analyzed the best interest of the child in light of the factors set out in Tenn. Code Ann. § 36-6-106(a). The court determined that on the basis of those factors, it was in the best interest of the child that Father be awarded custody of Joseph, and that he be designated as his primary residential custodian. Father's child support obligation was terminated as of June, 2008, and the issue of child support to be paid by Mother was reserved for a later hearing.[3] Mother filed a motion for new trial, or in the alternative to alter or amend the judgment. The trial court denied the motion. This appeal followed.

### III. ANALYSIS

#### A. The Standards for Decision and Review in Custody Cases

A decision on a request for modification of a parenting plan or a change of custody requires a two-step analysis. *Cranston v. Combs,* 106 S.W.3d 641, 644 (Tenn. 2003). A party petitioning to change an existing custody order must prove both (1) that a material change of circumstances has occurred and (2) that a change of custody or residential schedule is in the child's best interest. *Kendrick v. Shoemake,* 90 S.W.3d 566, 575 (Tenn. 2002). Only after a threshold finding that a material change of circumstances has occurred is the court permitted to go on to make a fresh determination of the best interest of the child. *Kendrick,* 90 S.W.3d at 569; *Blair v. Badenhope,* 77 S.W.3d 137, 150 (Tenn. 2002); *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006).

Resolving questions of custody and parenting are among the most important decisions that our courts are called upon to decide. *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007); *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). On appeal, we review the trial court's findings of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton,* 676 S.W.2d 554, 555 (Tenn. 1984).

When the evidence is in conflict and the trial court bases its factual findings on witness credibility, we must give considerable deference to those findings, because the trial court is in a far better position to observe the demeanor of the witnesses than is the appeals court. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Fell v. Rambo*, 36

---

[3]Mother's child support obligation was resolved by an agreed order, filed on October 5, 2011.

S.W.3d 837, 846 (Tenn. Ct. App. 2000). However, we review a trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).

## B. A Material Change of Circumstances

Turning to the first requirement for a change of custody, i.e., a material change of circumstances, the Tennessee Supreme Court has stated:

> Although there are no bright line rules as to whether a material change in circumstances has occurred after the initial custody determination, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston v. Combs,* 106 S.W.3d at 644 (citing *Kendrick v. Shoemake*, 90 S.W.3d at 570).

Mother argues on appeal that the trial court erred in finding that there has been any change of circumstances that could not have been reasonably anticipated since the agreed order of September 28, 2002. She contends that her frequent moves should be considered a normal consequence of the life of a single mother, and she insists that there was no proof that those moves affected Joseph's well-being in a negative way, since he did well in school before being placed in an accelerated program. But even if we accepted Mother's argument, we do not believe that it could have been anticipated that Mother would turn Joseph's care over to Father for an indefinite period of time. The evidence strongly suggests that Father's care has affected Joseph's well-being, but in a positive way.

Mother also challenges the trial court's consideration of her shoplifting arrest and conviction, since it occurred in 2004, four years before Father filed his petition. She asks rhetorically why Father did not file his petition right after the shoplifting incident occurred, if he considered it so significant. But we do not believe the passage of time has rendered Mother's shoplifting irrelevant, and there was no proof in the record that Father was even aware of her arrest record or her inclination to steal.

Mother admitted that she was convicted of shoplifting twice, but we do not know how many times she was not caught or was not charged. What we do know is that her child was aware that she "would steal all the time." She testified that she knew it was wrong, but that she had no regrets. The evidence shows that Joseph followed her example, so it certainly affected his well-being in a meaningful way, for the ultimate consequences of such behavior

are indisputably negative. Fortunately for Joseph, Father's attitude is different, and Joseph recognized that difference, as demonstrated by his comments recorded on the police report.

We are persuaded that the evidence does not preponderate against the trial court's conclusion that the combination of events it described amounted to a material change of circumstances that affected the child's well-being in a meaningful way.

## C. The Best Interest of the Child

Our legislature has set out a list of ten factors for the trial court to apply in cases involving custody to determine the best interest of a child. Tenn. Code Ann. § 36-6-106(a). The trial court applied those factors to this case, and determined that it was in Joseph's best interest that custody be awarded to Father. The findings in its custody order read as follows:

> (1) Love and affection and emotional ties during the first part of the child's life favored the Mother as the primary caregiver, although there was a dispute regarding the parenting time exercised by Father, in June 2008 the relationship with the child favored the Father;
> (2) The disposition of the parents to provide the necessities for the child were equal;
> (3) Continuity in the child's life favored the Father;
> (4) Stability of the family unit slightly favored the Father;
> (5) The mental and physical health of the parents were equal;
> (6) The home, school and community record of the child more recently favors the Father;
> (7) The preference of the child favors the Mother;
> (8) The physical and emotional safety of the child favors the Father due to the Mother's conviction of a crime committed in the presence of the child;
> (9) The character of others who interact with the child favors Father;
> (10) Past and future potential performance of parenting responsibility slightly favors Mother.

As this list demonstrates, neither party has a monopoly on good qualities, and some of the factors cited, like emotional ties and continuity, tilted in favor of Father only after the passage of time and his assumption of custody in June of 2008. Mother's attorney suggested during oral argument that Mother's motivation for asking Father to take care of Joseph was that she wanted the child to get to know his father better, and that she therefore allowed Father to take him "at her peril." She therefore implied that her client was being punished for doing the right thing for her child. The proof suggests, however, that Mother acted as much for her own convenience as for Joseph's benefit. Further, at this stage of the

proceedings the primary issue before the court is the best interest of the child, not the nature of Mother's motivation.

Mother also takes issue with several of the trial court's findings on the individual best interest factors. She argues, for example, that the court relied too much on fairly recent circumstances, and that it ignored evidence that Joseph also did well earlier, when he was still in Mother's custody. The language of the trial court's order shows, however, that it was well aware that some of the factors that favored Father resulted directly from his actions in the seventeen months between his assumption of temporary custody and the hearing on his petition. We do not believe that giving more weight to Joseph's more recent circumstances than to his earlier ones amounts to an error.

Mother also objects to the trial court's finding that her shoplifting conviction was relevant to the physical and emotional safety of the child. She argues (contrary to her position on some of the other factors) that because it occurred five years earlier it should no longer be considered. But it is apparent from the record that Mother's conduct continued to influence Joseph's behavior, even after Father assumed custody, and that while Mother has stated that she believes that shoplifting is wrong, there is nothing in the record to indicate that she has determined to avoid such behavior in the future. In sum, the evidence does not preponderate against the trial court's finding that it is in the best interest of Joseph to remain in Father's custody, and we affirm the trial court.

## IV.

The order of the trial court is affirmed. We remand this case to the Circuit Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Irtira Herbert.

_____
BEN H. CANTRELL, SP. JUDGE

-8-